PARMELIA ERRICKSON, appellant,

*v.*

GEORGE FIELDS, administrator &c. of Susan Fields, deceased, respondent.

1. The fact that a testatrix declared an instrument to be her last will, before she signed her name thereto, is a compliance with the statute which requires that a will be declared to be the last will of the person making it, in the presence of the witnesses.

2. The evidence in this case,—*Held*, to establish the testatrix's testamentary capacity, notwithstanding proof that she talked to herself, and seldom managed her own business matters.

Appeal from the decree of the orphans court of Monmouth county, refusing to admit the will of Hannah Errickson, deceased, late of that county, to probate.

*Mr. R. Allen, Jr.*, and *Mr. Wm. Silas Whitehead*, for appellant.

*Messrs. Beekman* and *Murphy*, for respondent.

THE ORDINARY.

The testatrix, Hannah Errickson, died at New Monmouth, in the county of Monmouth, in November, 1877. She was about fifty-four years old. She was never married. Her next of kin were her sister Parmelia Errickson, a maiden lady, with whom she lived and had lived for many years, and her sister Susan, wife of George Fields, who, with her husband, filed the *caveat* against admitting the will to probate, but died soon after filing the *caveat*.

On the 3d of February, 1876, the testatrix went, with her second cousin, Parmelia E. Cross, a lady of mature years, to Hightstown, in Mercer county, and there employed Mr. Samuel M. Schanck, an attorney and counsellor at law of that place, to draw her will. He thereupon drew it according to her instructions. By it, after directing the payment

of her just debts and funeral expenses, she gave all her property to her sister Parmelia, and appointed her second cousin, Charles J. Cross, of the city of New York, executor. Mr. Schanck, after drawing the will, placed a seal upon it, and handed it to the testatrix and her companion, at the same time giving them instructions as to the requisites to a proper formal execution of it, and advising that, as he was a stranger to her, and as he had heard that there had been some question as to whether she was of sound mind, its execution by her should be witnessed by persons who knew her, and knew that she had testamentary capacity. They took the will away, and subsequently the testatrix executed it in the presence of John H. King, then a neighbor of hers, and Miss Cross. She sent for Mr. King, and when he came to the house she came to the door and admitted him. After he entered the house she went out of the room, upstairs, for the will, and got it and brought it down, and, either just before or just after she brought it into the room, told him that she wanted him to witness her will. Before she signed it he asked her if she acknowledged it to be her last will and testament. She replied, yes. He then said to her, " Do you want your property or money to go as that paper calls for ?" To which she answered, " Yes ; I do not want Susan Fields to have any of my money, and would rather it would be in the middle of the sea than for George Fields to have it." The will was at the time lying open, on the table, before the testatrix and the witnesses. Miss Cross then wrote the words, " Hannah Errickson, her mark," at the foot of the will, and the testatrix thereupon took the pen out of her hand and made her mark in that place. After she had signed, King and Miss Cross signed as witnesses, at her request. After signing her name she said to Miss Cross, " Parmelia, now sign your name," but Miss Cross said, " No, let Mr. King sign his name first." Mr. King then, at the testatrix's request, signed his name, and then Miss Cross signed. During the signing the testatrix and the witnesses were seated at the same table, and they signed

in the presence of each other. The will was executed with all the formalities required by the statute. Though the declaration that it was her last will and testament was made before the testatrix signed, it is a compliance with the statute which requires that a will be declared to be the last will of the person making it, in the presence of the witnesses. *Rieben* v. *Hicks*, 2 *Bradf*. 353 ; *Nipper* v. *Groesbeck*, 22 *Barb*. 670 ; *Mundy* v. *Mundy*, 2 *McCart*. 290. The testatrix, on the occasion of executing the will, called it her last will and testament.

That she knew what her property was, of what it consisted, and how it was invested, and was capable of selecting the objects of her bounty, and fully understood the business in which she was engaged, is evident not only from the testimony of the gentleman who drew the will, but from that of the witnesses to the execution. Mr. Schanck says she came to his office and asked him to write the will. That she herself dictated its contents, that she told him what she wanted, and he thinks that no other person gave any instruction as to the manner of writing that paper or its contents ; that he undoubtedly read it over to her after it was drawn, and she was satisfied with it ; that he thought at the time that she understood all that was said, either between himself and Miss Cross (her companion), or himself and the testatrix ; that he does not recollect that Miss Cross said anything as to how the will should be drawn ; that all that was done was in accordance with the instructions of the testatrix, and that he understood her speech (she had an impediment in her speech), but had to be attentive.

The testimony on the subject of incapacity falls short of establishing it. The abstract opinions of the caveators' witnesses, none of whom are experts, and among whom the testamentary witnesses are not included, are in themselves of no importance. Cyrenius Conover says he thinks "idiocy was her trouble; that she had no mind of her own;" and yet he appears to have had a conversation with her, as he

says, about a week before she died, in which she spoke very intelligently about her money, referring to it as in Mr. Wilson's hands, and saying that her sister Parmelia had been endeavoring to get it out of his hands for a good while, but that she herself was satisfied that Mr. Wilson should hold it. He appears to base his opinion on the fact that she habitually spoke disconnectedly, and talked to herself, and, as he says, never attended to any matter of business. But other people had no great difficulty in understanding her speech. King, one of the witnesses to the will, says she was a "great talker." Mr. Schanck understood her. She stammered. The fact that she talked to herself is not of itself evidence of incapacity. It appears from the testimony of this witness that the testatrix did most of the housework of the house in which she and her sister lived, and that when her sister was away from home, as she very frequently was, the testatrix took charge of and kept the house alone; that she was almost always entirely alone in the house during her sister's absence, which was sometimes over night—but sometimes the testatrix would come to his house and say that she was alone, and ask his daughter to come and stay with her, which his daughter would occasionally do.

George W. Crawford says the testatrix was weak-minded, but it appears, from his testimony, that he had known nothing of her for the last eighteen years. He says that though she would sometimes come over to his house and stay half an hour or so, and go back again, she did not go visiting or to church, as other women did. It appears, in the testimony in the cause, that her reason for not going to church was the impediment in her speech, which subjected her to ridicule, and her lameness. This witness testifies that she could write her name, and it appears that he accepted a deed from her, the consideration of which ($4,000) he paid, and that the deed was drawn by Bennington F. Randolph, by whom the acknowledgment was taken, and her sister, Susan Fields, was one of the witnesses to her signature. And it may here be remarked, that there is no evidence of any deterio-

ration in her condition of mind at all. Conover says: "Her mind and actions have been pretty much the same all the way through, so far as I have noticed." William S. Taylor also says that her mental capacity was always about the same. Benjamin Griggs says that he did not consider the testatrix either an idiot or a fool; that there were some things about business and property which he thinks she knew nothing about; that she used to go to church six or eight years ago, but for the last six years had not gone much, but might have gone on some extra occasion; and he adds that she was not "much of a hand to go visiting." Richard Luffburrow expresses an opinion that she was rather weak-minded and easily persuaded, but he has not seen her to talk with her for the last seventeen or eighteen years. William S. Taylor, though he says he considered her incapable of doing business, testifies that she understood him when he spoke to her about her property, and that she was anxious about it; and it further appears that, for a service he had rendered her in regard to it, he expected compensation, and that he accepted a cow from her, accordingly. In the transaction of which he speaks, which was the obtaining from Garret W. Errickson of a reconveyance of land which she had conveyed to him, and the conveyance of it to one Crawford, she was treated as competent to accept a reconveyance and execute a deed for the property. Mr. William V. Wilson, another witness for the caveators, says that "her grade of intellect was a cross between idiocy and foolishness;" but it appears from his testimony that he held her money under a power of attorney given under the direction of Judge Randolph and ex-Governor Bedle, and others; that at one time, when he had paid the testatrix's sister Parmelia $500 of the money of the testratrix in his hands, he spoke to the latter about it, and she objected to it, and that he then wrote an agreement, to be signed by the testatrix; that she signed it, and he took it and kept it in his possession. He says that towards the last the testatrix made complaint to him; said she wanted her money; that

she did not know how much he had; that she did not know
the amount of interest, and that she said she wanted to lend
the money to Schanck Conover and Mr. Kirkman; but he
thinks she was then acting under the influence of those per-
sons, who came with her to his house to borrow the money
themselves.     He further says that she said repeatedly,
towards the last, that she did not want the money out of his
hands; that she wanted him to keep it.    He says she would,
in talking, set up her will against her sister Parmelia's, and
would complain that the latter was using up her money, and
not letting her have any of it, but was spending it in legal
proceedings.     He testifies that when her sister Parmelia
presented to him a bill against her, he spoke to the testatrix
about it then and afterward, and that she objected to it
because she thought her sister was charging her too much.
It appears also, it may be remarked, by the testimony of
other witnesses, that the testatrix objected to paying board
to her sister during the illness of the latter, because she was
then doing all the work of the house.    Mr. Wilson says he
almost invariably called the testatrix up when he paid
interest due her to her sister, and, telling her what it was,
and that he was about to pay it, asked her consent to the
payment.

I do not deem it necessary to refer at length to the testi-
mony on the subject of capacity, introduced by the propo-
nent.    It is enough to say that it shows that the testatrix,
at the time when she made the will, was fully possessed of
the requisite capacity for testamentary disposition of her
property.    And it may be remarked that it abundantly
appears that she, for reasons which she gave, was unwilling
that her sister Susan should have any part of her property.
She expressed her dislike of her sister Susan's husband, and
her unwillingness that he should have any of her money,
declaring that she would rather have it thrown into the road
and burned up.   She said he had treated her and all the family
so ill that she thought he ought not to have a cent, and she
had tried to fix it so he could not get a cent.   She said if

she should die she would leave all to Parmelia, for if she should leave it to Susan she was afraid George Fields would get it. She said she had no one else except Parmelia to whom to leave her money. In 1875 she had a will drawn by Mr. Hallenbake, in which she gave her property to her sister Parmelia. She then selected the executors, and spoke intelligently about the disposition of her property. It may be added that the facts stated in the testimony of Mr. Hallenbake, who, for seventeen years, resided within one hundred yards of her, and at whose store she made purchases, establishes her testamentary capacity. Nor am I able to conclude, from the testimony, that the will was the result of undue influence on the part of Parmelia Errickson. It was natural that the testatrix, who had lived so long with Parmelia, should have given to her all her property. And it is by no means surprising that, with the feeling which she evinced towards Susan and her husband, she should not have given any part of her property to the former. There is evidence that both Parmelia and the testatrix had the same dislike towards them, but there is no evidence of influence on the part of Parmelia to induce the testatrix to give her property, by her will, to her. Each of the three sisters had had her share of their father's property, and it appears that the testatrix thought that Susan had no claim upon her, and no right to expect any part of her share.

The decree of the orphans court, refusing to admit the will to probate, will be reversed, with costs, to be paid out of the estate.